Allen, J.
The first article of the treaty of Ghent between the United States and Great Britain stipulated for the restoration of all territory &c. taken by either party from the other, without causing any destruction or carrying away any of the artillery or other public property, originally captured in said forts or places, which remained there upon the exchange of the ratifications of the treaty, or any slaves or other private property.
The two governments differed as to the true construction of this article; the american government insisting that it extended to all slaves within their territory at *495 the time, whether on land, or on board the british cruisers; the english government, that the article applied to such slaves as were on shore. The two governments, not being able to agree, made and concluded a convention on the 20th day of October 1818, by which they referred the difference to the decision of the emperor of Russia. In this convention it was recited that the United States claimed for their citizens, and as their private property, the restitution of, or full compensation for, all slaves which were embraced by their construction of the treaty as aforesaid.
On the 22d of April 1822, the emperor of Russia made his award, sustaining the construction given to the treaty by the american government: the words of the award being, that “ the United States of America are entitled to claim from Great Britain a just indemnification for all private property which the british forces may have carried away, and as the question relates to slaves more especially, for all the slaves that the british forces may have carried away, from places and territories of which the treaty stipulates the restitution, in quitting these same places and territoriesand that “ the United States are entitled to consider as having been so carried away, all such slaves as may have been transferred from the above mentioned territories to british vessels wdthin the waters of the said territories, and who for this reason may not have heen restored.” On the 12th of July 1822, a convention was executed to carry into effect this award. By the first article, commissioners were to be appointed to ascertain and determine the amount of indemnif cation which might be due to citizens of the United States under the award. The average value to be allowed for each slave for whom indemnification might be due, was to be fixed. The evidence in support of the claims for indemnification was to be examined and decided on. And after the commissioners should have decided, the british government engaged *496 to cause the sum awarded to each and every owner in ^eu h*s slaves, to be paid at the times and places awarded, and on condition of such releases or assignments to be given, as the commissioners should direct. Difficuhies having arisen in the execution of this convention, on the 13th of November 1826 another convention was made, by which Great Britain agreed to pay and the United States to receive, for the use of the persons entitled to indemnification and compensation by virtue of the decision of the emperor of Russia and the subsequent convention, a specific sum in lieu of and in full and complete satisfaction for all sums claimed or claimable from Great Britain by any person under the said decision and convention. And the adjustment of the claims and distribution of the sum paid was to be made in such manner as the United States alone should determine. This ended the controversy between the two governments; and on the 2d of March 1827 an act of congress passed, creating a commission to determine on the claims, and directing the distribution of the money.
Certain slaves, the property of the appellant’s intestate, had been carried away. He died in 1825, leaving a widow; and after his death, his administrator preferred a claim and received a sum of money on account of these slaves. As the intestate died without issue, his widow claims, under our act of distributions, one half of the sum received as indemnity for the deported slaves, as her absolute property; and the administrator contends that she is entitled only to such interest in the money as she would have been entitled to in the slaves for which it was received, that is, an estate for life.
As Great Britain stipulated to restore the slaves and private properly which remained in the places designated, it is unnecessary to enquire what would have been the effect of the capture upon the title of the first *497 owner. By the jus postliminii, if the property so captured had been restored, and had come again into the power and possession of the original owner, his title would not have been considered as divested by the capture. But the property in question was not restored; the possession of the original owner was never resumed; and it would not be contended that under the provisions of this treaty, he could have followed the property, and asserted his claim to it as against individuals into whose hands it had fallen. His claim was, through his government, upon the government of Great Britain, and not to the specific chattel wherever it might be found. To constitute a complete title to the thing, possession must have been acquired; and that not being resumed, the claim of the original owner was, through his government, upon the foreign government for indemnity. It therefore would seem to follow, that as soon as it was ascertained that the property was not or could not be reclaimed, that fact destroyed all title to the identical property. Whatever was afterwards received on account of it, was so received by way of indemnity and compensation for the loss. If the case stood therefore upon the treaty of Ghent alone, it seems to me that in the event which has happened, the money paid could not, as between these parties, be regarded as slaves. To liken it to the case of private individuals, here was an executory contract to restore property, the title to which, under the laws of war, was divested by the capture, and by the continued possession of the enemy. Under the treaty and by right of postliminy, if the possession had been restored, the original title would have been revested and have overreached the capture. ' But it was not so restored; the title never did revest, and the claim of the party was for compensation for the breach in not restoring.
But the subsequent conventions between the governments would seem to remove all difficulty, as the owner *498 could claim only through the acts of his government. It had full authority to surrender his rights, or commute them, or accept such compensation for them as it thought proper. By the convention of 1818, the United States c]a;me(j for their citizens the restitution of, or full compensation for, all slaves carried away against the treaty as they construed it. This claim, thus stated in the alternative, was submitted to the arbitrator. He decided that they were entitled to indemnification from Great Britain for the slaves so carried away; and to render it perfectly certain for what this indemnity was to be paid, he further stated that they were entitled to consider as having been so carried away, all such slaves as might have been transferred &c. and who for this reason had not been restored; thereby shewing that after such carrying away, restitution could not be made, and therefore indemnification was given. The claim for restoration was submitted; the decision put an end to it by awarding indemnity, and is conclusive as to the title to the specific property.
After this award, restoration of the property is no more heard of. The convention of 1822, for carrying the award into effect, speaks of the indemnity alone, and fixes the mode by which the amount is to be ascertained and paid.
Some reliance was placed upon the clause in the treaty, by which the british government engaged to pay the sum awarded to the owner in lieu of his slaves, on condition of such releases and assignments to be given, as the commissioners should direct. I do not understand this as recognizing a right then subsisting to have the specific thing, (for that would be contradicting the words of the award and treaty,) but simply as shewing that the money was paid as an indemnity for the specific property for which compensation was awarded. And as to the releases or assignments, it is to be observed that, by the treaty, Great Britain was to pay to *499 each owner. The decision of the commissioners would furnish evidence of the claim ; and it was necessary for her security that some authentic evidence of the payment should be furnished. This, it seems to me, was the object of this clause. Cralle died after the ratification of this treaty. His right then, as secured by his government, was a right to a pecuniary indemnity for his loss, and the subsequent treaty and law merely provided for the payment, but did not vary the character of the subject. His administrator received it as a pecuniary compensation to which his intestate was entitled, and is bound to distribute it as other money of the estate.
I think the widow is entitled to claim the moiety as her absolute property, and that the decree should be affirmed.
Brooke and Baldwin, «7. concurring, decree affirmed.